UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL RAEDEKE,

                    Petitioner,

v.                                          CASE NO. 05-60276
                                            HONORABLE JOHN CORBETT O'MEARA
JAN TROMBLEY,

                    Respondent.
_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Michael Raedeke has filed a petition for the writ of habeas corpus under 28

U.S.C. §§ 2241 and 2254. The habeas petition challenges Petitioner's conviction for first-degree

murder. Respondent Jan Trombley urges the Court through counsel to deny the habeas petition.

Having reviewed the record, the Court concludes that Petitioner's claims lack merit.

Accordingly, the habeas petition will be denied.

## I. Background

Petitioner was charged in Genesee County, Michigan with premeditated murder, Mich.

Comp. Laws § 750.316(1)(b), felony murder, Mich. Comp. Laws § 750.316(1)(a), and first-

degree home invasion, Mich. Comp. Laws § 750.110a(2). The convictions arose from the brutal

beating of an elderly woman in her home on Craig Street in Flint, Michigan. The incident

occurred late on Friday night, October 15, 1999, or early on Saturday morning, October 16,

1999. There was no physical evidence linking Petitioner to the crime. However, six of his

friends, who spent all or a part of that weekend with Petitioner, testified against him at trial.

### A. The Trial

### 1. Key Prosecution Witnesses

Kevin Richardson testified that Petitioner left home four times on the night in question. The first time Petitioner left with Justin Heiser and Eric Shann. They came back with two bags of golf clubs. The same three young men left a second time. Richardson subsequently received a telephone call from Justin Heiser, who stated that they had thrown a rock at a lady's patio and set off an alarm. Petitioner, Justin, and Eric returned to Petitioner's home, but Petitioner left the house a third time. He returned and said that the lady had grabbed his arm. He had a radio, television, and some beer with him, and he stated that he could not have any witnesses and had some business to do. He then left once more, this time accompanied by Justin Heiser. When Petitioner returned home, he was carrying a baseball bat with blood on it and a coin container. Petitioner said that he had hit the lady on the head two times, paused, and then hit her a few more times.

Eric Shann admitted that he and Justin Heiser went for a walk with Petitioner on a Friday night in mid-October 1999. He claimed that Petitioner removed some golf clubs from a person's garage and that the group took the golf clubs back to Petitioner's home. The three of them went out a second time. They lost track of Petitioner, but heard an alarm sound. Eventually, all three of them returned to Petitioner's house. Petitioner then picked up a baseball bat and stated that he had to take care of business. He and Justin Heiser left the house. The two of them returned home separately. Petitioner was carrying the bat, which had blood on it, and Justin was carrying a barrel of pennies. Petitioner said that he had hit the lady with the bat eight times and that he had never killed anyone before that night.

Justin Heiser admitted to helping Petitioner steal two bags of golf clubs on a Friday night

in October of 1999.  He also admitted to being with Petitioner and Eric Shann when a burglar alarm was triggered later that night.  He returned to Petitioner's home and observed Petitioner leave the house a third time.  When Petitioner came back, he stated that he had got into an old lady's house and, as he was going through the house, the lady woke up, grabbed his arm, and looked at him.  Petitioner asked for a volunteer to help him take care of some business.  He said that he could not have any witnesses.  Justin offered to help, and the two of them went to a house where the back patio window was broken.  Petitioner had a wooden baseball bat and some gloves with him.  Justin initially stayed outside while Petitioner went in the house.  Justin heard some thumping noises and decided to go inside to look for something to steal.  He walked into a bedroom and saw someone lying in a bed.  Petitioner met him in the kitchen and gave him a barrel of coins, which he carried back to Petitioner's house.  Petitioner returned home with the bat and stated that he had never previously killed anyone.  Then he cried and instructed Justin not to say anything to anyone.

Justin informed the police that Petitioner had said he hit the victim with the bat and that she made a moaning noise.  Then he hit her a couple more times until she gurgled blood.  He continued to hit her until she stopped moving.

Charles ("Wes") Heiser was Justin Heiser's older brother.  He testified that, mid-October 1999, Petitioner pointed out a house on Craig Street and stated that he broke into the house during the previous night and killed a lady who was present in the house.  Petitioner explained to Wes that he broke a window in the house and set off an alarm, but later went back to the house and beat the woman to death with a ball bat because she woke up when he looked under the bed. Petitioner showed Heiser a cut on his leg, which he said that he received when he kicked in the

window.  He also showed Heiser some things that he had taken from the house.

Petitioner informed Jered Grierson that he cut his leg on a fence.  Jered learned about the murder from Wes Heiser, who informed him what Petitioner had said to him.  According to Jered, who spent about two or three hours at Petitioner's home on the night in question, Petitioner was drinking Tequilla and beer that night.

William Harris heard about the incident from Jered Grierson.  William asked Petitioner if he really did it and why.  Petitioner then put his head down, started to cry, and said, "I don't know."  Petitioner asked William for help in obtaining a bus ticket and, after his arrest, Petitioner wrote to William from jail.  In his letters, Petitioner stated that he wore leather gloves and left no fingerprints, and he mentioned that some of his friends had "snitched" on him.

### 2.  Defense Witnesses

The defense theory was that, due to Petitioner's history of behavioral, physiological, and psychological problems, as well as his use of alcohol and drugs on the night of the offense, he was not in control of himself and lacked the intent needed to be found guilty of first-degree murder and home invasion.  A clinical psychologist testified that Petitioner was not mentally ill, nor mentally retarded, but that he had an "oppositional deviant disorder" or anti-social type of personality disorder with a possible attention deficit disorder.  A physician testified that Petitioner was hyperactive and "mouthy" as a child and that she treated him for multiple allergies.  Petitioner's grandmother testified that Petitioner had problems at school because he lacked social skills, was "mouthy," could not concentrate, and was disrespectful.

### 3.  The Verdict and Sentence

On May 31, 2000, the jury found Petitioner guilty as charged.  The trial court sentenced

Petitioner to life imprisonment for both murder convictions and to a concurrent sentence of ten to twenty years in prison for the home invasion.

### B.  The Direct Appeal and Post-Conviction Proceedings

Petitioner appealed his convictions, alleging that (1) the trial court should have instructed the jury on the lesser-included offense of manslaughter and (2) his convictions violated the principle of double jeopardy because there was one murder and the home invasion was the underlying felony for the felony murder conviction.  The Michigan Court of Appeals agreed with Petitioner's double jeopardy argument.  It vacated Petitioner's conviction for home invasion and remanded Petitioner's case for entry of a judgment of sentence reflecting a single first-degree murder conviction and sentence supported by two different theories.  *See People v. Raedeke*, No. 229128 (Mich. Ct. App. May 14, 2002).  Petitioner raised his claim about the jury instructions in the Michigan Supreme Court, which denied leave to appeal because it was not persuaded that the question should be reviewed.  *See People v. Raedeke*, 467 Mich. 948; 656 N.W.2d 525 (2003) (table).

Petitioner presented his habeas claims in a post-conviction motion for relief from judgment, which the trial court denied in a reasoned opinion.  The Michigan Court of Appeals denied leave to appeal the trial court's decision on the basis that Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Raedeke*, No. 256349 (Mich. Ct. App. Dec. 16, 2004).  On November 29, 2005, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Raedeke*, 474 Mich. 931; 706 N.W.2d 23 (2005) (table).

### C.  The Habeas Petition and Procedural Default Defense

Petitioner filed his habeas corpus petition through counsel on December 2, 2005. His claims are:

I.      The prosecutor denied Petitioner a fair trial where, in a case with a partly inculpatory statement by Petitioner, he falsely told the jury without evidence that the petitioner admitted to police that he committed the crime in this case;

II.     Petitioner was denied due process and other rights where jurors were unable to hear the testimony;

III.    Petitioner's statement to police while under arrest was improperly admitted because of violation of the *Miranda* rule;

IV.    Petitioner was prejudiced by ineffective assistance of trial counsel; and

V.      Petitioner was prejudiced by ineffective assistance of appellate counsel.

Respondent argues in a responsive pleading that Petitioner's claims are procedurally defaulted because he did not raise the claims on direct appeal from his convictions. Procedural default is not a jurisdictional bar to substantive review of a meritless claim, *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)), and because Petitioner's claims lack merit, the Court will excuse the alleged procedural default and review Petitioner's claims.

## II.  Standard of Review

Habeas petitioners are entitled to the writ of habeas corpus only if they can show that the state court's adjudication of their claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). Furthermore, section "2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted). In addition, "state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004).

## III. Discussion

### A. Petitioner's Statement to the Police and the Prosecutor's Comment on it

Sergeant Terry Van Keuren of the Flint Police Department testified that he and his fugitive team were asked to arrest Petitioner for murder. On October 20, 1999, at 2:15 p.m., Sergeant Van Keuren observed Petitioner walking on the sidewalk in the 3100 block of Leith Street in Flint. He approached Petitioner and advised him that he was under arrest. As he handcuffed Petitioner, he asked Petitioner whether he knew why he was under arrest. According to Sergeant Van Keuren, Petitioner began to cry and said, "Yes, but I was doping and drinking when I did it." Tr. at 289.[1] In his closing argument, the prosecutor said,

> I don't have to rely just on these friends of his; he admits to Sgt. Van Keuren that he killed her, saying that he was drinking and doping when I did it. When he killed Rose Hickey. That's what Sgt. Van Keuren testified to.

Tr. at 841. Petitioner claims that his statement to Sergeant Van Keuren should have been suppressed and that the prosecutor misstated the evidence when he said that Petitioner admitted to committing the crime.

### 1. Admission of the Statement

Petitioner claims that his statement to Sergeant Van Keuren was improperly admitted in evidence because he was not warned of his constitutional rights before he made the statement. The trial court adjudicated this claim on the merits and concluded that there was no interrogation and, therefore, the officer did not violate the dictates of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

---

[1] "Tr." refers to the transcript of trial, which consists of five volumes consecutively paginated.

### a. *Miranda*

The Supreme Court stated in *Miranda* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." *Id.* at 444. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (footnotes omitted) (emphasis in original).

> "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining" what the police reasonably should have known. *Innis, supra,* 446 U.S., at 302, n. 8, 100 S.Ct., at 1690, n. 8. Thus, custodial interrogation for purposes of *Miranda* includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have . . . the force of a question on the accused," *Harryman v. Estelle,* 616 F.2d 870, 874 (CA5 1980), and therefore be reasonably likely to elicit an incriminating response.

*Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

### b. Application

Sergeant Van Keuren testified at trial that he did not invite a response from Petitioner when he asked whether Petitioner knew why he was being arrested. Van Keuren also claimed that he did hold any further discussion with Petitioner and that Petitioner blurted out his response about drinking and "doping." Because Van Keuren's question was merely attendant to Petitioner's arrest, it did not constitute "custodial interrogation." *Innis*, 446 U.S. at 301.

Even if the Court were to assume that Sergeant Van Keuren's sole question to Petitioner constituted custodial interrogation or the functional equivalent of interrogation, Petitioner's response was unforeseeable. He could have answered "No" to the question or he could have said that he had heard rumors of people falsely accusing him of criminal conduct. Sergeant Van Keuren could not have reasonably believed that Petitioner would incriminate himself with the admission that he "did it." Nor is there any reason to believe that Petitioner was susceptible to providing an incriminating response. Therefore, Sergeant Van Keuren was not required to read Petitioner's *Miranda* rights to him, and Petitioner's statement was admissible in evidence.

### 2. The Prosecutor's Comment

Petitioner alleges that the prosecutor deprived him of a fair trial by informing the jury that Petitioner admitted to Sergeant Van Keuren that he committed the crime. Petitioner contends that the prosecutor's remarks were not based on facts in evidence and that the prosecutor became a witness when he made the remarks.

The trial court stated on review of this claim that a reasonable person could have concluded from Petitioner's response and from all the other evidence in the case that Petitioner was acknowledging his guilt in the murder. The trial court concluded that the prosecutor's remark was fair comment on the evidence presented at trial.

### a. Legal Framework

Prosecutors may not misrepresent facts in evidence, nor assert facts never admitted in evidence. *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000); *see also Hodge v. Hurley*, 426 F.3d 368, 380 (6th Cir. 2005); *Byrd v. Collins,* 209 F.3d 486, 535 (6th Cir. 2000). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). To prevail on his prosecutorial-misconduct claim, Petitioner must demonstrate that the prosecutor's conduct infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). On habeas review, the complained-of conduct must be both improper and flagrant, *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006), *cert. denied*, __ U.S. __, 127 S. Ct. 1376 (2007), and "'so egregious as to render the entire trial fundamentally unfair.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)). Moreover, claims of prosecutorial misconduct are subject to harmless-error analysis. *Id*.

### b. Application

Petitioner asserts that the prosecutor's argument was misleading because his (Petitioner's) comment that he "did it" could have been an admission that he committed a crime such as the larceny or home invasion, which witnesses described to the jury. Although Petitioner apparently did not explain to Sergeant Van Keuren what he meant by "it" when he said that he "did it," the prosecutor reasonably inferred that Petitioner was offering an excuse for the murder, which was the most serious offense he allegedly committed. Prosecutors may "forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005). Consequently, the prosecutor's comment was not improper. Even if the remark was improper, it could not have had a "substantial and injurious effect or influence" on the jury's verdict and was harmless in light of the overwhelming evidence that Petitioner killed the occupant of the home he invaded. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).[2]

### B. The Jurors' Ability to Hear

Petitioner alleges that he was denied due process of law and other rights because the jurors were unable to hear the testimony. The trial court stated on review of this claim that references in the record to testimony being inaudible were not significant and did not deprive Petitioner of due process. The court noted that many of the inaudible comments occurred during

---

[2] "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, 507 U.S. 619, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1967)]." *Fry v. Pliler*, __ U. S. __, __, 127 S. Ct. 2321, 2328 (2007).

*voir dire* and in many other instances the clear import of the testimony could be obtained from the context.

Petitioner has not cited any Supreme Court case directly on point. However, the Supreme Court has held that defendants in criminal cases are entitled to a jury trial, *Boykin v. Alabama*, 395 U.S. 238, 243 (1969), and to a fair trial, *Brown v. United States*, 411 U.S. 223, 231 (1973) (quoting *Bruton v. United States*, 391 U.S. 123, 135 (1968) (quoting *Lutwak v. United States*, 344 U.S. 604, 619 (1953)). It follows that Petitioner had a right to have the jurors hear the proceedings. The purpose of a public trial is to guarantee that the accused will be fairly dealt with and not unjustly condemned. *Estes v. Texas*, 381 U.S. 532, 538-39 (1965).

During *voir dire*, one prospective juror (Richard Grezelak) stated that he had nerve deafness in his right ear and that he was having a difficult time hearing the conversation. A second prospective juror (Theodore McIntosh) also expressed difficulty in hearing the proceedings. Tr. at 33-34. Both jurors apparently deliberated Petitioner's case. However, the trial court moved them to the front row of the jury box so that they could hear better. Tr. at 33-35. Both the trial court and the prosecutor instructed the jurors to raise their hands if they did not hear or understand what was being said. Tr. at 34 and 57. And when the trial court asked Grezelak and McIntosh whether they thought their hearing difficulties were going to be a problem, both jurors indicated that they could manage. McIntosh stated that it would be fine so long as they could raise their hands when they could not hear, and Grezelak agreed that it would be alright to assume that they heard everything unless they informed the trial court otherwise. Tr. at 70-71. Neither the prosecutor nor defense counsel asked the trial court to remove McIntosh or Grezelak for cause.

Although the transcript of the trial reflects that some words were inaudible,[3] the prosecutor advised the jurors during his opening statement to let him know if there was a hearing problem.  Tr. at 155.  Throughout the remainder of the trial, the trial court and the attorneys encouraged witnesses or each other to speak up.  Tr. at 173, 180, 243, 286, 398-99, 428, 433, 455, 472, 518, 531, 564, 588, 652-53, and 732-33.

On the third day of trial, the trial court asked the jurors whether they were hearing alright. One juror answered, "Most of the time."  When the trial court expressed concern about the juror's ability to hear only "most of the time," the juror said, "At times it's difficult to hear, but I'm getting the information."  The trial court concluded that the juror was understanding the proceedings.  The court then repeated that, if at any time the jurors could not hear the proceedings, they should raise their hands.  Tr. at 452-53.  A subsequent witness was permitted to use a microphone.  Tr. at 603.

Although Petitioner may not have had a perfect trial, he did have a fair trial, which is all that the Constitution requires.  *United States v. Hasting*, 461 U.S. 499, 508-09 (1983).  Accordingly, he has no right to relief on the basis of his claim about the jurors' ability to hear the trial testimony.

### C.  Trial Counsel

Petitioner alleges next that he was deprived of effective assistance of trial counsel.  The trial court adjudicated this claim on the merits and concluded that trial counsel was not ineffective.  To prevail on a claim of ineffective assistance of counsel, Petitioner must

---

[3]  The proceedings apparently were recorded and later transcribed, because the trial court stated during *voir dire* that a microphone in the courtroom was recording the proceedings, not amplifying them.  Tr. at 19.

demonstrate that his attorney's "performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. Because of the difficulties inherent in evaluating defense counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

### 1. Failure to Object

Petitioner claims that his trial attorney should have objected to: (a) Sergeant Van Keuren's testimony concerning what Petitioner said at his arrest; (b) the prosecutor's comment that Petitioner admitted to committing the crime when Sergeant Van Keuren arrested him; and (c) the jurors inability to hear. The trial court reviewed these claims and concluded that:

defense counsel would have been unsuccessful if he had contested the admissibility of Sergeant Van Keuren's testimony; an objection to the prosecutor's argument would not have been proper or sustained because the argument was fair comment; and the issue about the sound quality was an insignificant one and, therefore, defense counsel was not ineffective for failing to raise that issue.          This Court concluded above that Sergeant Van Keuren did not violate Petitioner's constitutional rights when he failed to read the *Miranda* rights to Petitioner and that the prosecutor's related comment concerning what Petitioner said to Sergeant Van Keuren was a reasonable inference from the evidence.  Even if constitutional error occurred in admitting Petitioner's statement to Van Keuren or in allowing the prosecutor to comment on the statement, the alleged errors were harmless in light of the overwhelming evidence that Petitioner killed the victim.  Therefore, defense counsel's allegedly deficient performance on matters related to Petitioner's statement to Sergeant Van Keuren did not prejudice the defense.

As for the hearing problems during trial, defense counsel asked the trial court on a number of occasions to have the witnesses speak up or repeat their testimony.  Tr. at 180, 366, 399, 433, 461, 519, 567, 572.  At other times, the prosecutor or the trial court told the witnesses to speak up, and the trial court instructed the jurors to raise their hands if they could not hear. Petitioner has not shown that his attorney's failure to make a formal objection to the hearing difficulties was the result of deficient performance.

### 2.  Conceding Guilt

Petitioner faults his trial attorney for insinuating that he (Petitioner) killed the victim. The trial court reviewed this claim and concluded that the position taken by trial counsel was one of trial strategy, which it would not second guess.  The trial court opined that defense counsel

did not have much evidence with which to work, given the overwhelming testimony against his client.

In a capital case such as this one,[4] "counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." *Florida v. Nixon*, 543 U.S. 175, 192 (2004). Therefore, a reviewing court may not presume that a defense attorney's strategy prejudiced the defense; instead the two-pronged test of *Strickland* (deficient performance and prejudice) applies. *Id*. at 189-90 (explaining that the presumption of prejudice set forth in *United States v. Cronic*, 466 U.S. 648 (1984), is reserved for situations in which counsel failed to function as the client's advocate and that *Strickland* requires showing that counsel's concession strategy was unreasonable).

In Michigan, "[f]irst-degree murder is punishable by mandatory life imprisonment *without* the possibility of parole. Second-degree murder is punishable by imprisonment for *any term of years* or life, *with* the possibility of parole." *People v. Wesley*, 421 Mich. 375, 412; 365 N.W.2d 692, 709 (1984) (emphasis in original). In light of these penalties and the overwhelming evidence against Petitioner, it was reasonable for defense counsel to say that, if the jury accepted the testimony of Petitioner's friends, the witnesses established that Petitioner performed the acts for which he was accused. Tr. at 854. It was realistic to insinuate that Petitioner killed the victim and to argue that he lacked the requisite intent to be found guilty of first-degree murder. In so doing, the attorney obviously was trying to avoid a sentence of life imprisonment without the possibility of parole. This approach did not rank as a "fail[ure] to function in any meaningful

---

[4] Although Michigan does not have the death penalty, the penalty for first-degree murder is the most severe penalty in the State: life imprisonment without the possibility of parole. Therefore, first-degree murder arguably is a capital offense in Michigan.

sense as the Government's adversary." *Cronic*, 466 U.S. at 666. "[C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade.'" *Nixon*, 543 U.S. at 192 (quoting *Cronic,* 466 U.S. at 656 n. 19).

### 3. The Defense

Petitioner alleges that his trial attorney failed to investigate and present a competent defense of diminished capacity. The trial court stated on review of this claim that it would not second guess defense counsel's trial strategy and that it was unwilling to fault the attorney for attempting to offer some evidence, which might serve to mitigate Petitioner's culpability in the jurors' eyes.

### a. Duty to Investigate

The Supreme Court stated in *Strickland* that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-691.

"[T]he duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard,* 545 U.S. 374, 383 (2005). The test is whether the evidence which was not revealed, "taken as a whole, might well have influenced the jury's appraisal of [Petitioner's] culpability" and whether "the

likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached . . . ." *Id.* at 393 (citations and quotation marks omitted).

The defense theory in this case was diminished capacity, which

> allows a defendant, even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime. "[T]he theory is that if because of mental disease or defect a defendant cannot form the specific state of mind required as an essential element of a crime, he may be convicted only of a lower grade of the offense not requiring that particular mental element."

*People v. Carpenter*, 464 Mich. 223, 232; 627 N.W.2d 276,280-81 (2001) (citations omitted).

Although the defense was abolished in *Carpenter*, *see id.*, 464 Mich. at 241; 627 N.W.2d at 285, it was a viable defense at the time of Petitioner's trial.

### b. Application

None of Petitioner's witnesses testified that he was unable to form specific intent when he committed the crimes, but they did testify about Petitioner's physical and behavioral problems, which defense counsel claimed was part of the reason that Petitioner could not be held responsible for the crime. There was additional evidence that Petitioner had been drinking Tequilla and beer and smoking marijuana on the night of the murder and that he was so drunk that he was swerving when he walked. Defense counsel's theory of diminished capacity might be considered sound trial strategy in light of Petitioner's background and his condition on the night of the murder. Petitioner has not suggested another defense that his attorney could have used.

Petitioner apparently believes that defense counsel could have found a witness capable of testifying that Petitioner lacked specific intent to commit first-degree murder or first-degree home invasion. Even if such a witness existed, the witness's testimony would have conflicted

with other evidence suggesting that Petitioner's behavior was goal-directed. Witnesses testified that Petitioner left home with the intent to steal items and that he returned home to get a baseball bat and gloves after the victim observed him in her home. He went back to the victim's home after stating that he had some business to do and that he could not have any witnesses. He subsequently admitted to killing the victim, and he expressed a plan to hide the baseball bat that he used during the killing. In letters written to a friend after his arrest, he stated that he used gloves to avoid leaving fingerprints. Given this evidence of Petitioner's intentions and thinking on the night of the murder, there is not a reasonable probability that the result of the trial would have been different if defense counsel had presented more evidentiary support for the diminished-capacity defense.

### D. Appellate Counsel

The fifth and final claim alleges that Petitioner's appellate attorney was ineffective for not raising the above claims on direct appeal. Petitioner contends that the double jeopardy issue raised on direct appeal did not help him and that the issue about the jury instructions was frivolous because there was no testimony to justify an instruction on manslaughter. The trial court determined on post-conviction review that the issues in Petitioner's motion for relief from judgment were not meritorious and, therefore, appellate counsel was not required to raise them.

#### 1. Legal Framework

The Court of Appeals for the Sixth Circuit has explained that

> [a] criminal appellant is constitutionally entitled to the effective assistance of counsel in his direct appeal. *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Joshua v. DeWitt,* 341 F.3d 430, 441 (6th Cir. 2003). In *Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir. 1999), the court attempted to provide a non-exclusive list of factors to consider when defining deficient performance:

1. Were the omitted issues "significant and obvious?"

2. Was there arguably contrary authority on the omitted issues?

3. Were the omitted issues clearly stronger than those presented?

4. Were the omitted issues objected to at trial?

5. Were the trial court's rulings subject to deference on appeal?

6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7. What was the appellate counsel's level of experience and expertise?

8. Did the petitioner and appellate counsel meet and go over possible issues?

9. Is there evidence that counsel reviewed all the facts?

10. Were the omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Ibid.* In addition to the *Mapes* factors, a habeas court may also consider "[p]revailing norms of practice as reflected in American Bar Association standards and the like." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). . . .

Appellate counsel is, of course, not required to raise every non-frivolous issue on appeal. "As the Supreme Court has recently observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. In such cases, the petitioner must demonstrate that the issue not presented 'was clearly stronger than issues that counsel did present.' " *Caver v. Straub,* 349 F.3d 340, 348 (6th Cir. 2003) (quoting *Smith v. Robbins,* 528 U.S. 259, 289, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)) (internal citations omitted); *see also McFarland v. Yukins,* 356 F.3d 688, 710-12 (6th Cir.2004).

*Franklin v. Anderson*, 434 F.3d 412, 428-29 (6th Cir. 2006), *cert. denied sub nom Houk v.*

*Franklin*, __ U.S. __, 127 S. Ct. 941 (2007).

## 2. Application

Petitioner prevailed on one of his appellate issues, and although the other issue may have been frivolous, the habeas issues are not clearly stronger when one considers the overwhelming evidence against Petitioner. Moreover, there were no objections to some of the alleged trial errors, and a claim of ineffective assistance of trial counsel likely would have been unsuccessful because the alleged deficiencies did not prejudice the defense.

Having determined that Petitioner's current claims lack merit, it follows that appellate counsel's failure to raise the issues was not unreasonable and affords no basis for concluding that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *McMeans v. Brigano*, 228 F.3d 674, 683 (6th Cir. 2000). Failing to raise a meritless claim does not constitute ineffective assistance of appellate counsel. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

## IV. Conclusion

The trial court's adjudication of Petitioner's claims on their merits did not result in an unreasonable determination of the facts. Nor was the trial court's decision contrary to, or unreasonable application of, Supreme Court precedent. Accordingly, the petition for a writ of habeas corpus [Doc. 1, Dec. 2, 2005] is DENIED.


                                                 s/John Corbett O'Meara
                                                 United States District Judge

Date: February 28, 2008

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, February 28, 2008, by electronic and/or ordinary mail.

s/William Barkholz
Case Manager